# EXHIBIT C

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


CISCO SYSTEMS, INC., CIENA CORPORATION,
CORIANT OPERATIONS, INC., CORIANT (USA) INC., and
FUJITSU NETWORK COMMUNICATIONS, INC.,
Petitioner,

v.

CAPELLA PHOTONICS, INC.,
Patent Owner.
_____

Case IPR2014-01166[1]
Patent RE42,368
_____

Before JOSIAH C. COCKS, KALYAN K. DESHPANDE, and
JAMES A. TARTAL, *Administrative Patent Judges*.

TARTAL, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a)* and *37 C.F.R. § 42.73*

---

[1] IPR2015-00816 was joined with IPR2014-01166 on September 4, 2015, by
Order in IPR2015-00816, Paper 12 (IPR2014-01166, Paper 26).

# I.  INTRODUCTION

Petitioner, Cisco Systems, Inc., Ciena Corporation, Coriant Operations, Inc., Coriant (USA) Inc., and Fujitsu Network Communications, Inc., filed petitions requesting an *inter partes* review of claims 1–6, 9–13, and 15–22 of U.S. Patent No. RE42,368 ("the '368 patent").  Paper 2 ("Petition" or "Pet."); *see also* IPR2015-00816, Paper 1.  Based on the information provided in the Petition, and in consideration of the Preliminary Response (Paper 7; *see also* IPR2015-00816, Paper 10) of Patent Owner, Capella Photonics, Inc., we instituted a trial pursuant to 35 U.S.C. § 314(a) of: (1) claims 1–6, 9–11, 13, and 15–22 as obvious over Bouevitch,[2] Smith[3], and Lin[4] under 35 U.S.C. § 103(a); and, (2) claim 12 as obvious over Bouevitch, Smith, Lin, and Dueck[5] under 35 U.S.C. § 103(a).  Paper 8 ("Institution Decision"); *see also* IPR2015-00816, Paper 11.

After institution of trial, Patent Owner filed a Response (Paper 19, "Response" or "PO Resp.") and Petitioner filed a Reply (Paper 25, "Pet. Reply").  The Petition is supported by the Declaration of Dr. Dan Marom (Ex. 1028).  The Response is supported by the Declaration of Dr. Alexander V. Sergienko (Ex. 2004).

---

[2] U.S. Patent No. 6,498,872 B2, issued December 24, 2002 (Ex. 1003, "Bouevitch")

[3] U.S. Patent No. 6,798,941 B2, issued September 28, 2004 (Ex. 1004, "Smith").

[4] U.S. Patent No. 5,661,591, issued August 26, 1997 (Ex. 1010, "Lin")

[5] U.S. Patent No. 6,011,884, issued January 4, 2000 (Ex. 1021, "Dueck")

A transcript of the Oral Hearing conducted on November 5, 2015, is entered as Paper 43 ("Tr.").[6]

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons that follow, Petitioner has shown by a preponderance of the evidence that claims 1–6, 9–13, and 15–22 of the '368 patent are unpatentable.

## II. BACKGROUND

### A. The '368 patent (Ex. 1001)

The '368 patent, titled "Reconfigurable Optical Add-Drop Multiplexers with Servo Control and Dynamic Spectral Power Management Capabilities," reissued May 17, 2011, from U.S. Patent No. 6,879,750 ("the '750 patent"). Ex. 1001. The '750 patent issued April 12, 2005, from application number 10/745,364, filed December 22, 2003.

According to the '368 patent, "fiber-optic communications networks commonly employ wavelength division multiplexing (WDM), for it allows multiple information (or data) channels to be simultaneously transmitted on a single optical fiber by using different wavelengths and thereby significantly enhances the information bandwidth of the fiber." *Id.* at 1:37–42. An optical add-drop multiplexer (OADM) is used both to remove wavelengths selectively from a multiplicity of wavelengths on an optical fiber (taking away one or more data channels from the traffic stream on the

---

[6] Patent Owner's objections to Petitioner's demonstrative slides for the oral hearing are denied because we are not persuaded that Petitioner's demonstratives add new argument. *See* Paper 41. Moreover, demonstrative slides are not evidence and have not been relied upon for this final decision.

fiber), and to add wavelengths back onto the fiber (inserting new data channels in the same stream of traffic). *Id.* at 1:45–51.

The '368 patent describes a "wavelength-separating-routing (WSR) apparatus that uses a diffraction grating to separate a multi-wavelength optical signal by wavelength into multiple spectral channels, which are then focused onto an array of corresponding channel micromirrors." *Id.* at Abstract. "The channel micromirrors are individually controllable and continuously pivotable to reflect the spectral channels into selected output ports." *Id.* According to Petitioner, the small, tilting mirrors are sometimes called Micro ElectroMechanical Systems or "MEMS." Pet. 7.

The WSR described in the '368 patent may be used to construct dynamically reconfigurable OADMs for WDM optical networking applications. *Id.* Figure 1A of the '368 patent is reproduced below.



**Fig. 1A**

Figure 1A depicts wavelength-separating-routing (WSR) apparatus 100, in accordance with the '368 patent. WSR apparatus 100 is comprised of an array of fiber collimators 110 (multiple input/output ports, including input port 110-1 and output ports 110-2 through 110-N), diffraction grating 101 (a

4

wavelength separator), quarter wave plate 104, focusing lens 102 (a beam-focuser), and array of channel micromirrors 103. Ex. 1001, 6:57–63, 7:55–56.

A multi-wavelength optical signal emerges from input port 110-1 and is separated into multiple spectral channels by diffraction grating 101, which are then focused by focusing lens 102 into a spatial array of distinct spectral spots (not shown). *Id*. at 6:64–7:2. Channel micromirrors 103 are positioned such that each channel micromirror receives one of the spectral channels.

Figure 1B of the '368 patent is reproduced below.



**Fig. 1B**

Figure 1B depicts a close-up view of the array of channel micromirrors 103 shown above in Figure 1A. *Id*. at 8:6–7. The channel micromirrors "are individually controllable and movable, e.g. pivotable (or rotatable) under analog (or continuous) control, such that, upon reflection, the spectral channels are directed" into selected output ports by way of focusing lens 102 and diffraction grating 101. *Id*. at 7:6–11.

According to the '368 patent:

> each micromirror may be pivoted about one or two axes. What is important is that the pivoting (or rotational) motion of each channel micromirror be individually controllable in an analog manner, whereby the pivoting angle can be continuously adjusted so as to enable the channel micromirror to scan a spectral channel across all possible output ports.

*Id*. at 9:8–14.

Figure 3 of the '368 patent is reproduced below.



**Fig. 3**

Similar to Figure 1A, above, Figure 3 also shows a WSR apparatus as described by the '368 patent. Ex. 1001, 10:25–26. In this embodiment, two-dimensional array of fiber collimators 350 provides an input port and plurality of output ports. *Id*. at 10:31–32. First and second two-dimensional arrays of imaging lenses 360, 370 are placed in a telecentric arrangement between two-dimensional collimator-alignment mirror array 320 and two-dimensional fiber collimator array 350. *Id*. at 10:37–43. "The channel micromirrors 103 must be pivotable biaxially in this case (in order to direct its corresponding spectral channel to anyone of the output ports)." *Id*. at 10:43–46.

6

The WSR also may incorporate a servo-control assembly (together termed a "WSR-S apparatus").  *Id*. at 4:65–67.  According to the '368 patent:

> The servo-control assembly serves to monitor the power levels of the spectral channels coupled into the output ports and further provide control of the channel micromirrors on an individual basis, so as to maintain a predetermined coupling efficiency of each spectral channel in one of the output ports. As such, the servo-control assembly provides dynamic control of the coupling of the spectral channels into the respective output ports and actively manages the power levels of the spectral channels coupled into the output ports.

*Id*. at 4:47–56.

Figure 5 of the '368 patent is reproduced below.



**Fig. 5**

Figure 5 depicts OADM 500 in accordance with the '368 patent composed of WSR-S (or WSR) apparatus 510 and optical combiner 550.  *Id*. at 12:40–44.  Input port 520 transmits a multi-wavelength optical signal, which is separated and routed into a plurality of output ports, including pass-through port 530 and one or more drop ports 540-1 through 540-N.  *Id*. at 12:44–48.  Pass-through port 530 is optically coupled to optical combiner 550, which

combines the pass-through spectral channels with one or more add spectral channels provided by one or more add ports 560-1 through 560-M. *Id.* at 12:52–56. The combined optical signal is then routed into an existing port 570, providing an output multi-wavelength optical signal. *Id.* at 12:56–58.

### B. Illustrative Claims

Challenged claims 1, 15, 16, and 17 of the '368 patent are independent. Claims 2–6 and 9–13 ultimately depend from claim 1 and claims 18–22 ultimately depend from claim 17. Claims 1 and 17 of the '368 patent are illustrative of the claims at issue:

> 1. An optical add-drop apparatus comprising
> an input port for an input multi-wavelength optical signal having first spectral channels;
> one or more other ports for second spectral channels; an output port for an output multi-wavelength optical signal;
> a wavelength-selective device for spatially separating said spectral channels; [and]
> a spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels, each of said elements being individually and continuously controllable *in two dimensions* to reflect its corresponding spectral channel to a selected one of said ports *and to control the power of the spectral channel reflected to said selected port.*

Ex. 1001, 14:6–20.

> 17. A method of performing dynamic add and drop in a WDM optical network, comprising
> separating an input multi-wavelength optical signal into spectral channels;
> imaging each of said spectral channels onto a corresponding beam-deflecting element; and
> controlling dynamically and continuously said beam-deflecting elements *in two dimensions* so as to combine selected ones of said spectral channels into an output

> multi-wavelength optical signal *and to control the power of the spectral channels combined into said output multi-wavelength optical signal.*

Ex. 1001, 16:3–14.

## III.    ANALYSIS

### A.    Real Party-In-Interest

Patent Owner contends that trial should be terminated because Petitioner did not identify "Cisco's indemnified for the accused products" as a real party-in-interest "pursuant to California Commercial Code § 2312(3)." PO Resp. 59.  Patent Owner provides virtually no explanation of its contention, fails to analyze any facts relative to its contention, and directs us to no legal authority in support of its contention.  Accordingly, we are not persuaded that trial should be terminated under the circumstances presented.

### B.    Claim Construction

Only terms which are in controversy need to be construed, and then only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999).

1.    *"to reflect"* and *"to control"*

Independent claims 1, 15, and 16 each recite outside of the preamble:

> a spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels, each of said elements being individually and continuously controllable in two dimensions <u>to reflect its corresponding spectral channel</u> to a selected one of said ports and <u>to control the power of the spectral channel reflected</u> to said selected port.

Ex. 1001, 14:14– 20, 15:14–20, 15:31–37 (emphases added). Independent claim 17 contains a similar limitation.[7] Petitioner contends that the "to reflect" and "to control" clauses are non-functional clauses that say nothing about the claimed structure, and, therefore, are non-limiting. Pet. 10–11. We disagree. Although "apparatus claims cover what a device is, not what a device does," the language at issue here describes the function that the apparatus must be capable of performing. *Hewlett-Packard Co. v. Bausch & Lomb, Inc*., 909 F.2d 1464, 1468 (Fed.Cir.1990); *see also K-2 Corp. v. Salomon S.A*., 191 F.3d 1356, 1363 (Fed. Cir. 1999) (explaining that functional language is an additional limitation in the claim). In that regard, the pertinent clauses are, thus, functional rather than non-functional. Accordingly, the claimed "spatial array of beam-deflecting elements" is further limited to a spatial array that satisfies the "to reflect" and "to control" functional limitations.

2. "*continuously controllable*"

Claim 1 requires "a spatial array of beam-deflecting elements . . . each of said elements being individually and continuously controllable." Similarly, claim 17 requires "controlling dynamically and continuously said beam-deflecting elements." Petitioner asserts that "continuously controllable" should be construed to mean "under analog control." Pet. 12.

---

[7] Claim 17 recites: "controlling dynamically and continuously said beam-deflecting elements in two dimensions so as to combine selected ones of said spectral channels into an output multi-wavelength optical signal and to control the power of the spectral channels combined into said output multi-wavelength optical signal." Ex. 1001, 16:9–14.

Petitioner identifies the following disclosures of the '368 patent as supporting its proposed construction:

> The patent explains that "[a] distinct feature of the channel micromirrors in the present invention, in contrast to those used in the prior art, is that the motion…of each channel micromirror is under **analog control** such that its pivoting angle can be **continuously adjusted**." ([Ex. 1001], 4:7–11; emphasis added). Another passage in the specification states that "[w]hat is important is that the pivoting (or rotational) motion of each channel micromirror be individually **controllable in an analog manner**, whereby the pivoting angle can be continuously adjusted so as to enable the channel micromirror to scan a spectral channel across all possible output ports." (*Id.*, 9:9–14; emphasis added). Yet another passage states that "channel micromirrors 103 are individually controllable and movable, e.g., pivotable (or rotatable) under analog (or continuous) control." (*Id.*, 7:6–8).

Pet. 12–13.

Dr. Marom also explains that "MEMS can be operated using analog voltage for continuous control," and states that a person of ordinary skill in the art would understand continuous control "is achieved via analog voltage control." Ex. 1028 ¶¶ 36, 58.

Patent Owner suggests in its Response that analog control does not necessarily provide the claimed "continuously controllable" beam deflecting elements (PO Resp. 42 n.4),but during the oral hearing counsel for Patent Owner indicated that "continuously controllable" was defined as "analog control," and then clarified that Patent Owner "did not offer a specific definition of continuously control." Paper 43, 57:1–58:2. Additionally, according to Dr. Sergienko, "continuous control cannot be shown by the input signal (*i.e.*, analog vs. digital) alone." Ex. 2004 ¶ 181.

Based on all of the evidence presented, we are not persuaded that "continuously controllable" is limited to "analog control," or that "analog control" necessarily corresponds to "continuous" control under all circumstances. Indeed, counsel for Petitioner suggested that although the art at issue disclosed analog control that provided continuous control, counsel further recognized that it may operate differently outside of that art. *See* Paper 43, 30:24–31–6. We determine that "continuously controllable," in light of the specification of the '368 patent, encompasses "under analog control such that it can be continuously adjusted."

    3.    "port"

Claim 1 requires "an input port . . . one or more other ports. . . [and] an output port." Patent Owner contends that in the '368 patent "the structure or elements making up the ports are collimators." PO Resp. 33. Patent Owner offers no definition of "port," and does not suggest that the '368 patent provides an express definition of the term, but instead argues that a "port," as claimed, is not a "circulator port" because the '368 patent "disavows circulator-based optical systems." *Id*. at 34. We disagree.

There is no dispute that the ordinary and customary meaning of "port" encompasses circulator ports, and, indeed, any "point of entry or exit of light." *See* Dr. Sergienko Deposition Transcript (Ex. 1039), 43:16–23, 45:12–13 ("The circulator ports are ports with constraints."). Nor does the '368 patent equate the term "port" to "collimator," as both "port" and "collimator" appear separately in the claims of the '368 patent. Ex. 1001, 14:7, 14:48–51. We have considered the testimony of Dr. Sergienko as well (Ex. 2004 ¶¶ 146–167), and find that even if certain fiber collimators serve

12

as ports in the '368 patent, that does not redefine the term "port" to mean "collimator." *See id*. at ¶ 154. Thus, the primary issue is whether the '368 patent disavows circulator ports from the scope of the term "port."

Although the broad scope of a claim term may be intentionally disavowed, "this intention must be clear," *see Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope,"), and cannot draw limitations into the claim from a preferred embodiment." *Conoco, Inc. v. Energy & Envtl. Int'l*., 460 F.3d 1349, 1357 (Fed. Cir. 2006).

Patent Owner fails to show any "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope" with respect to the use of "port" in the '368 patent. Patent Owner argues that the '368 patent provides a scalable system without circulator ports, that a provisional application to the '368 patent "describes existing add/drop architectures that had a number of problems" (PO Resp. 36), that Dr. Marom obtained a patent in which collimators serve as the ports, and that "[b]ecause the inventors of the '368 [p]atent consistently emphasized the limitations of circulators and the '368 [p]atent discloses an alternative configuration, a [person of ordinary skill in the art] would have understood that the inventors were disavowing the use of optical circulators." PO Resp. 37; *see also* PO Resp. 33–35 and 38–40 (citing Ex 2004 ¶ 161).

We do not discern any "clear disavowal of claim scope" from the arguments advanced by Patent Owner. Dr. Sergienko merely states that a

person of ordinary skill in the art "would read the '368 patent as teaching away from or at the least discouraging the use of circulators." Ex. 2004, ¶ 160. Even if the '368 patent were viewed as Dr. Sergienko suggests, teaching away or discouragement is not disavowal. Moreover, Petitioner further demonstrates that a provisional application to the '368 patent in fact uses circulator ports as "ports." Pet. Reply 12–13 (citing Ex. 1008, 4, Fig. 9). Such usage undermines Patent Owner's disavowal contention. We have considered all of the arguments advanced by Patent Owner in its effort to redefine "port" as excluding "circulator ports" (PO Resp. 33–40), and find insufficient support for Patent Owner's contention that the '368 patent disavows circulator ports from the scope of the term "port." We determine that "port," in light of the specification of the '368 patent, encompasses "circulator port."

4. *"beam focuser"*

Claim 11 requires a "beam-focuser for focusing said separated spectral channels onto said beam deflecting elements." The '368 patent states that "[t]he beam-focuser may be a single lens, an assembly of lenses, or other beam focusing means known in the art." Ex. 1001, 4:20–22.

Petitioner contends that "beam focuser" is "a device that directs a beam of light to a spot." Pet. 15–16. According to Petitioner:

> The Summary of the '368 patent states that the "beam-focuser focuses the spectral channels into corresponding spectral spots." ([Ex. 1001], 3:63-64.) The specification also explains that the beams of light are "focused by the focusing lens 102 into a spatial array of distinct spectral spots (not shown in FIG. lA) in a one-to-one correspondence." (*Id.*, 6:65-7:5.) The MEMS mirrors are in turn "positioned in accordance with the spatial array formed

14

> by the spectral spots, such that each channel micromirror
> receives one of the spectral channels." *Id*.)

*Id*. Patent Owner does not dispute expressly Petitioner's proposed construction, and provides no alternative construction of "beam focuser." Consistent with Petitioner's proposed construction, Dr. Sergienko testified that "focusing means bringing of the energy in the original image limited to the focal spot." Ex. 1039, 245:17–19. We agree that, based on the specification of the '368 patent, "beam focuser" means "a device that directs a beam of light to a spot."

     5.      "*dynamically*"

Claim 17 recites "[a] method of performing dynamic add and drop in a WDM optical network, comprising: . . . controlling dynamically and continuously said beam-deflecting elements in two dimensions." Ex. 1001, 16:3–10. Petitioner contends that "[t]he plain and ordinary meaning of 'dynamically' in the context of the '368 patent is 'during operation.'" Pet. 55 (citing Ex. 1003, 3:22–23 (contrasting routing that is fixed during operation: "the [prior art] wavelength routing is intrinsically static, rendering it difficult to dynamically reconfigure these OADMs."); Ex. 1028 ¶ 121)). It is unclear how Petitioner equates "dynamically" to "during operation" from the citation provided. Patent Owner does not propose a definition of "dynamically."

The '368 patent uses "dynamic" and "dynamically" throughout the specification, stating, for example, that "[t]he power levels of the spectral channels in the output ports may be dynamically managed according to demand." Ex. 1001, 11:30–32. We determine from the specification that

the '368 patent uses "dynamically" in contrast to "static," in accordance with its ordinary and customary meaning.

### 6. Additional Claim Terms

Petitioner addresses several additional claim terms, including "servo-control assembly," "spectral monitor," and "in two dimensions." Pet. 9–15. For purposes of this decision, no express construction of any additional claim term is necessary.

### C. *References Asserted as Prior Art*

Petitioner relies on Bouevitch, Smith, Lin, and Dueck with respect to its assertion that the challenged claims would have been obvious.

### 1. Bouevitch

Bouevitch describes an optical device for rerouting and modifying an optical signal, including modifying means such as a MEMS array and a liquid crystal array which function as an attenuator when the device operates as a dynamic gain equalizer (DGE), and as a switching array when the device operates as a configurable optical add/drop multiplexer (COADM). Ex. 1003, Abstract. According to Petitioner, the COADM described in Bouevitch "uses MEMS mirrors with 1 axis of rotation." Pet. 19. Petitioner also contends that the Bouevitch COADM controls the power of its output channels by tilting beam-deflecting mirrors at varying angles. Pet. 18.

### 2. Smith

Smith describes an optical switch including an array of mirrors tiltable about two axes, permitting a mirror tilt axis to be used for switching and a perpendicular axis to be used for power control. Ex. 1004, Abstract, 16:34–51; *see also* Ex. 1005, 6 (describing the same). Petitioner contends that "to

16

the extent Bouevitch does not disclose 2-axis mirrors and their intended use for power control, both the Smith Patent and the Smith ['683] Provisional each does so." Pet. 19. Petitioner asserts that Smith is § 102(e) prior art as of the September 22, 2000, filing date of the Smith '683 Provisional. Pet. 17–18, 60. Patent Owner argues that Smith is not prior art to the '368 patent because the portions of Smith Petitioner relies upon are not entitled to the filing date of the Smith '683 Provisional. PO Resp. 56–59.

During this proceeding, the Federal Circuit issued a decision in *Dynamic Drinkware, LLC, v. National Graphics, Inc*., 800 F.3d 1375 (Fed. Cir. 2015), addressing the necessary showing for a patent to claim priority from the filing date of its provisional application. The court found that the petitioner in the underlying *inter partes* review proceeding did not demonstrate that the prior art patent relied upon was entitled to the benefit of the filing date of its provisional application because the petitioner did not show written description support in the prior art provisional application f*or the claims of the prior art patent*. *Id*. at 1378. Thus, demonstrating only that the provisional application of the prior art patent provided a written description of the *subject matter* in the prior art patent relied upon to establish the unpatentability of the challenged claims was insufficient to show that the prior art patent was entitled to the benefit of the filing date of its provisional application. *Id*.

In this case, Petitioner recognized that it had not shown in the Petition that the Smith '683 Provisional provided written description support *for the claims of Smith* and requested an opportunity to address the issue in light of *Dynamic Drinkware*. *See* Paper 28 (authorizing additional briefing). With

our prior authorization, Petitioner filed a brief addressing the holding in *Dynamic Drinkware* and whether the Smith '683 Provisional provides written description support for the claims of Smith (Paper 34). Patent Owner filed a brief in response (Paper 37).

The parties generally agree that Smith is § 102(e) prior art as of the filing date of the Smith '683 Provisional if the Smith '683 Provisional provides written description support for: (1) the subject matter Petitioner relies upon in Smith to show the unpatentability of the challenged claims of the '368 patent, and (2) the invention of Smith.[8] *See* Paper 34, 2; *see also* Paper 37, 1 ("When relying on a provisional's filing date for a § 103 rejection, a petitioner must show: (1) the subject matter was carried over from the provisional application and (2) the patent's claims have § 112 support in the provisional application.")

---

[8] We agree with Petitioner that it need not show that every claim of Smith is supported by the Smith '683 Provisional to demonstrate that subject matter disclosed in both Smith and the Smith '683 Provisional is entitled to the benefit of the filing date of the Smith '683 Provisional. *See* Paper 34, 3. We also need not reach, and take no position on Petitioner's suggestion that *Dynamic Drinkware* is invalid to the extent it conflicts with *In re Klesper*, 397 F.2d 882 (CCPA 1968) (stating "[i]t is also well settled that where a patent purports on its face to be a "continuation-in-part" of a prior application, the continuation-in-part application is entitled to the filing date of the parent application as to all subject matter carried over into it from the parent application, whether for purposes of obtaining a patent or subsequently utilizing the patent disclosure as evidence to defeat another's right to a patent. 35 U.S.C. §§ 102(e), 120; *Goodyear Tire & Rubber Co. v. Ladd*, 121 U.S. App. D.C. 275, 349 F.2d 710, (1965), certiorari denied 382 U.S. 973, 86 S. Ct. 536, 15 L.Ed.2d 465; *Asseff v. Marzall*, 88 U. S. App. D.C. 358, 189 F.2d 660, (1951), certiorari denied 342 U.S. 828, 72 S. Ct. 51, 96 L. Ed. 626; *In re Switzer*, 166 F.2d 827, 35 CCPA 1013.").

First, Petitioner has shown sufficiently that the Smith '683 Provisional provides written description support for at least two claims of Smith. Petitioner provides a claim chart identifying each of the limitations of claim 1 of Smith and the corresponding written description support as disclosed by the Smith '683 Provisional. Paper 34, attached claim chart. Petitioner also identifies written description support in the Smith '683 Provisional for Smith claim 28. *Id.* at 5.

We have considered Patent Owner's argument that the claim chart provided by Petitioner "is mere attorney argument and does not even attempt to demonstrate what a [person of ordinary skill in the art] would understand or whether the disclosure has §112 support in the Provisional," and find it not persuasive. Paper 37, 5. Patent Owner identifies no authority for the proposition that an expert declaration is necessary to show written description support. Patent Owner's further argument that Petitioner "is wrong" in its assertion that the "movable mirror" of Smith is supported by the disclosure of "elements that can be rotated in an analog fashion," is not persuasive because it is conclusory and does not address the full disclosure identified by Petitioner.

Second, Petitioner has shown sufficiently that the Smith '683 Provisional provides written description support for certain subject matter Petitioner relies upon in Smith to show the unpatentability of the challenged claims of the '368 patent (i.e., that "the subject matter was carried over from the provisional application.") According to Petitioner, the Smith '683 Provisional "describes 'a mirror array with elements that can be rotated in an analog fashion about two orthogonal axes,' with one axis for switching, and

one axis for power." Pet. 19 (quoting Ex. 1004, 6). In support of Petitioner's contention that Smith is § 102(e) prior art, Dr. Marom testifies that the Smith '683 Provisional discloses all of the features of Smith relied upon to demonstrate unpatentability. Ex. 1028 ¶ 131. In his declaration, Dr. Marom provides a chart identifying the claimed subject matter of the '368 patent and the corresponding disclosures in both Smith and the Smith '683 Provisional. *Id*. ¶ 132. In particular, Dr. Marom identifies the "individually and continuously controllable in two dimensions" limitation of claims 1, 15, 16, and 17 of the '368 patent as being described by the Smith '683 Provisional as a "mirror array with elements that can be rotated in an analog fashion about two orthogonal axes." *Id*. (quoting Ex. 1005, 6) (emphasis omitted).

Patent Owner argues that the Smith '683 Provisional does not provide written description support for Smith's disclosure of the "continuously controllable" limitation of the '368 patent. PO Resp. 57–58. Although Dr. Marom expressed the opinion that the Smith '683 Provisional discloses the "continuously controllable" limitation based on its disclosure of "analog" control, Petitioner does not rely only on Smith as disclosing the "continuously controllable" limitation. *See* Pet. 19. Accordingly, whether the Smith '683 Provisional discloses the "continuously controllable" limitation has no bearing on whether Smith is available as prior art for any other disclosure upon which Petitioner relies. Similarly, to the extent Patent Owner argues that a gimbal structure described in Smith was not disclosed in the Smith '683 Provisional, Patent Owner's argument is beyond the scope of the claims of the '368 patent, which do not require a particular gimbal

structure, and is not persuasive as Petitioner does not rely on the disclosure of a gimbal structure to demonstrate the unpatentability of any claim of the '368 patent.

Patent Owner also contends that the Smith '683 Provisional does not disclose certain limitations of claim 17 concerning dynamic control. We will discuss whether the Smith '683 Provisional and Smith disclose these features of claim 17 in our analysis of claim 17 below. *See* PO Resp. 58–59. More broadly, we determine that Smith is available as prior art with an effective date of the filing date of the Smith '683 Provisional for subject matter carried over to Smith from the provisional application, including the disclosure of 2-axis mirrors to control switching and power.

3.      Lin

Lin describes a "spatial light modulator… operable in the analog mode for light beam steering or scanning applications." Ex. 1010, Abstract. Lin explains that the angular deflection of a mirror about the torsional axis is a function of the voltage potential applied to an address electrode. *Id*. at 6:29–32. Petitioner contends that Figure 3B of Lin depicts a continuous and linear relationship between the deflection angle of the MEMS mirrors and the applied voltage. Pet. 29.

4.      Dueck

Dueck describes a wavelength division multiplexer that integrates an axial gradient refractive index element with a diffraction grating to provide efficient coupling from a plurality of input sources. Ex. 1021, Abstract. Petitioner contends that Dueck describes various diffraction gratings for use in WDM devices. Pet. 18.

##### D. Asserted Obviousness Over Bouevitch, Smith, and Lin

Petitioner asserts that claims 1–6, 9–11, 13, and 15–22 would have been obvious over Bouevitch, Smith, and Lin.[9]  Pet. 23–60.

##### 1. Claim 1

Claim 1, directed to an optical add-drop apparatus, requires "an input port . . . one or more other ports . . . [and] an output port."  Petitioner asserts that Bouevitch discloses an optical add-drop apparatus, including an input port (labeled "IN"), one or more other ports (labeled 80b "IN ADD" and "OUT DROP"), and an output port (labeled "OUT EXPRESS"), as recited by claim 1 of the '368 patent.  Pet. 24 (citing Ex. 1003, Fig. 11).  Petitioner's contentions are supported by Dr. Marom.  Ex. 1028 ¶¶ 49–52.

Patent Owner argues that, under its proposed claim construction of "port," Bouevitch discloses at most two ports because the '368 patent equates "port" to "collimator" and disavows circulator ports.  PO Resp. 31–41.  For the reasons explained above in our claim construction analysis for "port," we reject Patent Owner's claim construction for "port."  Accordingly, we do not agree with Patent Owner's contention that the only

---

[9] Petitioner initially argues that Patent Owner admitted in a Replacement Reissue Application Declaration by Assignee that all elements of claim 1, except for two-axis mirrors, were disclosed by Bouevitch.  Pet.7–9 (quoting Ex. 1002, 81–82).  Petitioner identifies no persuasive authority for the proposition that such a statement should be treated as an admission in this proceeding.  Moreover, rather than admit that all original elements of claim 1 are disclosed by Bouevitch, the statement makes clear that three additional references not relied upon by Petitioner in this proceeding were considered in combination with Bouevitch.  As a result, we are not persuaded that Patent Owner has admitted all elements of claim 1, except for two-axis mirrors, were disclosed by Bouevitch.

ports disclosed by Bouevitch are collimator lenses 12a and 12b. Petitioner has shown, as discussed above and as supported by Dr. Marom, that Bouevitch discloses the recited input, output, and one or more other ports, as recited by claim 1.

Claim 1 requires "a wavelength-selective device" for spatially separating spectral channels. Petitioner identifies diffraction grating 20 of Bouevitch as corresponding to the recited "wavelength-selective device." Pet. 26. Claim 1 also requires "a spatial array of beam-deflecting elements." Petitioner identifies MEMS mirror array 50 of Bouevitch as corresponding to the recited "spatial array of beam-deflecting elements positioned such that each element receives a corresponding one of said spectral channels." Pet. 26–27. Patent Owner does not dispute Petitioner's contentions, with which we agree.

For each of the beam-deflecting elements, claim 1 further requires that they be "individually and continuously controllable *in two dimensions* to reflect its corresponding spectral channel to a selected one of said ports *and to control the power of the spectral channel reflected to said selected port*." As explained by Dr. Marom, Bouevitch discloses the use of variable attenuation for power control, and a person of ordinary skill in the art would understand that the necessary level of control required to balance the optical power differentials among the wavelength channels is achieved in Bouevitch with continuous control over the mirror tilt via analog voltage control. *See* Ex. 1028 ¶ 58, *see also* Ex. 1003, 7:35–37 ("The degree of attenuation is based on the degree of deflection provided by the reflector (i.e., the angle of reflection)." Patent Owner does not dispute Petitioner's contention that

Bouevitch discloses continuous control of beam-deflecting elements via analog voltage control with respect to a single axis. Instead, Patent Owner argues that "Petitioner explicitly concedes that Bouevitch does not teach or suggest beam-deflection elements that are continuously controllable *in two dimensions*." PO Resp. 42 (emphasis added).

There is no dispute that Petitioner relies on Smith as disclosing the control of beam-deflection elements in two dimensions. Petitioner explains that Smith describes a "multi-wavelength . . . optical switch including an array of mirrors tiltable about two axes, both to control the switching and to provide variable power transmission." Pet. 31 (quoting Ex. 1004, Abstract). Patent Owner does not dispute that Smith discloses beam-deflecting elements individually controllable in two dimensions, or that such control is used "to reflect" and "to control the power," as recited by claim 1.

The dispute of the parties with regard to Smith more significantly focuses on whether Smith discloses "continuous control." As discussed above, we reject Petitioner's assertion that "continuous control" means "under analog control," and determine instead that the term encompasses "under analog control such that it can be continuously adjusted." According to Petitioner:

> Smith teaches continuous control of its MEMS mirrors in an analog manner, where the force used to tilt the mirrors is "approximately *linearly* proportional to the magnitude of the applied voltage." (*Id*., 15:41–42, 6–35; 17:1–23; Ex. 1028 at ¶ 59.) This linear proportionality is another way of describing a continuous, analog, relationship between the voltage driving the mirrors and the resulting mirror angle. (Ex. 1028 at ¶ 59.)

Pet. 28. The Smith '683 Provisional also states that elements "can be rotated in an analog fashion." Ex. 1005, 7. Stating that the control is "in an analog

manner" or reflects an "analog" relationship, however, is not sufficient to persuasively establish that the mirrors of Smith are "under analog control." Nor has Petitioner sufficiently shown that the "analog fashion" referred to in the Smith '683 Provisional necessarily was carried forward to Smith.

Patent Owner further asserts with respect to Smith that a person of ordinary skill in the art "would view tilting according to large and small angles and [pulse width modulation] more akin to step-wise digital control than analog control." PO Resp. 45–46 (further indicating that other patents and patent applications related to Smith use digital control). In response, Petitioner does not dispute that Smith relies on digital control, but instead argues that Dr. Sergienko testified that digital control does not preclude "continuous control." Pet. Reply 22. We agree that "continuous control" is not limited to analog control; however, Petitioner's contention is that Smith discloses "continuous control" because Smith discloses "analog control," not that digital control in Smith is "continuous control." We are not persuaded that Smith discloses "continuous control" on this record because Petitioner has not shown either that the mirrors of Smith are "under analog control" or that Smith's use of digital control constitutes "continuous control."

Petitioner also contends that Lin discloses "continuous control." Pet. 29–30. Lin describes a spatial light modulator (SLM) operable in the analog mode for light beam steering or scanning applications. Ex. 1010, Abstract. Figures 3A and 3B of Lin are reproduced below.



FIG. 3A

FIG. 3B

Figure 3A is a spatial light modulator, "illustrating the pixel being deflected about the torsion hinge to steer incident light in a selected direction, the deflection of the pixel being a function of the voltage applied to the underlying address electrode." Ex. 1010, 5:20–25. As Petitioner explains, Figure 3B shows a graph disclosing the continuous deflection angle of MEMS mirrors as a function of the voltage applied to affect that deflection. Pet. 29. Dr. Marom testifies that Lin "confirms that continuous and analog control of MEMS mirrors was known prior to the '368 patent's priority date." Ex. 1028 ¶ 61. Lin explains that "the angular deflection of mirror 42 about the torsional axis defined by hinges 44 is seen to be a function of the voltage potential applied to one of the address electrodes 60." Ex. 1010, 6:29–32. Lin further explains that:

26

> With an address voltage being applied to one address electrode
> 60 being from 0 to 20 volts, mirror 42 is deflected proportional
> to the address voltage. When SLM 40 is operated as an optical
> switch or light steerer, incident light can be precisely steered to
> a receiver such as an optical sensor or scanner. The mirror tilt
> angle can be achieved with a excellent accuracy for pixel
> steering.

*Id*. at 7:13–19.

Patent Owner argues that Petitioner hasn't shown that Lin discloses continuous control because such control cannot be shown by the input signal alone, and Petitioner did not "look at the structure of the mirror and how the voltage affects movement of the mirror." PO Resp. 49. Patent Owner's conclusory and unsupported argument is not persuasive because it does not address the disclosures of Lin as summarized above, which we find establish "continuous control," as recited in claim 1.

Patent Owner also argues that Lin does not disclose continuous control in two dimensions. *Id*. at 49–50. Petitioner, however, relies on Smith, not Lin, as disclosing 2-axis mirrors, and there is no contention that Lin, alone, discloses continuous control in two dimensions.

In summary, for the reasons discussed above, Petitioner has established that Bouevitch discloses all of the recited limitations of claim 1 for an array of mirrors individually and continuously controllable on a single axis, but not on a two axis (i.e., two dimension) array "to reflect its corresponding spectral channel to a selected one of said ports and to control the power of the spectral channel reflected to said selected port." Patent Owner did not dispute that Bouevitch discloses continuous control of beam-deflecting elements via analog voltage control with respect to a single axis, and Petitioner has demonstrated that Lin also discloses such "continuous

control." Finally, Petitioner has established that Smith discloses an array of mirrors controllable in two dimensions "to reflect" and "to control," as recited by claim 1. Thus, the remaining issue is whether Petitioner has provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007).[10]

With respect to a rationale for combining Bouevitch and Smith, Petitioner contends the use of the two-axis mirror of Smith in Bouevitch: (1) is a simple substitution of one known element for another yielding predictable results, (2) is the use of a known technique to improve similar devices, (3) would be obvious to try as there are only two options for tilting MEMS mirrors: one-axis and two-axis mirrors, and (4) would be motivated to reduce crosstalk in attenuation and to increase port density. Pet. 20–21.[11]

Petitioner also contends that several reasons support the addition of Lin's continuous, analog control to the asserted combination, including

---

[10] The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, and (3) the level of skill in the art; and (4) secondary considerations, i.e. objective evidence of unobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We have considered each of the Graham factors and incorporate our discussion of those considerations, to the extent there is a dispute, in our evaluation of the reasoning that supports the asserted combination. We further observe that, in this proceeding, evidence of secondary considerations has not been offered for evaluation.

[11] Petitioner also argues, without citing authority, that Patent Owner admitted the "combinability" of references during prosecution, and that such admission applies to the references identified by Petitioner in "the identical technology area." Pet. 22–23. We find no such admission.

interchangeability with discrete-step mirrors and more precision in matching the optimal coupling value.  Pet. 30.

Patent Owner disputes the sufficiency of the rationale provided in the Petition.  PO Resp. 17–31.  First, Patent Owner argues that Petitioner "conflates disparate embodiments of Bouevitch," "one functioning in a DGE to control power [shown in Bouevitch Figure 5] and one functioning in COADM to control switching [shown in Bouevitch Figure 11]." *Id*. at 17–18.  Petitioner, however, persuasively explains that it does not rely on an embodiment of Bouevitch functioning to control power to show that the features of claim 1 were disclosed in the asserted art.  Pet. Reply 2–3 ("[Bouevitch] Fig. 5 is not relevant to Petitioner's positions or the institution. . . . Figure 11 includes the relevant disclosure.").  Instead, Petitioner relies on Smith as disclosing power control, stating in the Petition that "Smith describes a 'multi-wavelength . . . optical switch including an array of mirrors tiltable about two axes, both to control the switching and to provide variable power transmission.'"  Pet. 31 (quoting Ex. 1004, Abstract).

Although Petitioner includes a discussion of Bouevitch's disclosure of power control in the Petition, it is clear that the asserted combination does not stand or fall on that disclosure.  The Petition states that a person of ordinary skill in the art "would be motivated to use the 2-axis system of Smith within the system of Bouevitch for power control."  Pet. 34. Petitioner's discussion of the power control embodiment of Bouevitch in support of the rationale for the asserted combination with Smith (i.e., both Smith and Bouevitch address power control) does not impose an obligation

on Petitioner to articulate a rationale for including the power control embodiment of Bouevitch in the asserted combination.

Patent Owner also argues that Petitioner implicitly relies on the power control embodiment of Bouevitch to show that Bouevitch discloses beam deflecting mirrors that are continuously controllable. PO Resp. 21. We are persuaded that, to the extent Petitioner relies on Bouevitch as disclosing reflectors that are continuously controllable based on the power control embodiment of Bouevitch (*see* Pet. 28 (quoting Ex. 1001 discussing the embodiment shown in Figure 5 of Bouevitch)), Petitioner was obligated to, and did not, provide a rationale for combining an embodiment of Bouevitch directed to power control with an embodiment relied on by Petitioner to show switching control.[12] Petitioner, however, further relies on Lin as disclosing continuous control. Accordingly, Petitioner may show unpatentability based on the combination of Bouevitch, Smith, and Lin without relying on the power control embodiment of Bouevitch, and without providing a rationale for incorporating the power control embodiment of Bouevitch in the asserted combination.

Patent Owner also argues that a person of ordinary skill in the art would not have combined Bouevitch and Smith for various reasons. PO

---

[12] Petitioner argues in its Reply that Bouevitch teaches a MEMS structure for switching in Figure 11 that also performs power control; however, Petitioner has not shown sufficiently that it presented this contention in the Petition, or that its arguments were not intertwined with its assertions related to Bouevitch Figure 5. Similarly, Petitioner did not contend in the Petition, as it does in its Reply, that Bouevitch inherently discloses angular misalignment for power control. *See* Pet. Reply 5–6. Arguments made for the first time in a reply generally are not given consideration.

Resp. 22–31. Patent Owner argues that Petitioner has not reconciled "the technical differences between the references," or explained whether the components "would continue to operate as desired." *Id*. at 23. Patent Owner lists many considerations an optical system architect would have to take into account purportedly not addressed in the Petition. *Id*. at 23–24. Patent Owner further asserts that Dr. Marom has designed a two-axis mirror to replace a two-axis mirror, and that "[r]e-designing micromirrors is not a simple substitution because the redesign is complex." *Id*. at 24–25. In this proceeding, however, Dr. Sergienko was asked whether such technical considerations presented problems that could not be overcome by one of skill in the art, and indicated "no." Ex. 1039, 266:16–267:25. Moreover, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference. . . . Rather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). Here, the test for obviousness reflects what the combined teachings of Bouevitch, Lin, and Smith would have suggested to one of ordinary skill in the art, and does not require that any one particular component of a reference must be bodily incorporated, or physically inserted, into another reference.

Patent Owner argues more particularly that a person of ordinary skill in the art "would not have been motivated to use Smith's mirrors in the Figure 5 embodiment in Bouevitch." PO Resp. 25. Patent Owner's argument is not persuasive because, as discussed above, Petitioner does not rely on the Figure 5 embodiment in Bouevitch.

31

Next, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to combine Smith's tiltable mirrors with Bouevitch because it would disrupt Bouevitch's explicit teaching of parallel alignment," and "Bouevitch discourages, if not teaches away from, misalignment to control power." PO Resp. 26–30. "The prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed in the … application." *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). While Bouevitch discusses how angular displacement is disadvantageous in certain respects (*see* Ex. 1028, 2:1–7), we are not persuaded such discussion is sufficient to constitute a teaching away. To the contrary, Petitioner has shown persuasively that Bouevitch uses angular misalignment to control power in at least some embodiments of Bouevitch. Pet. Reply 3–5; *see also* Ex. 1028 ¶ 71.

Patent Owner also argues that absent hindsight, a person of ordinary skill would not have incorporated the two-axis mirror of Smith into Bouevitch, which uses a one-axis mirror, because a two-axis mirror is "a more complex structure." PO Resp. 30–31. We find Patent Owner's argument conclusory and not persuasive because it fails to address the benefits of a two-axis mirror disclosed by Smith which would be apparent to one of skill in the art without hindsight. *See* Ex. 1004, 7:1–52. We also find persuasive Petitioner's contention that it would have been obvious to try, because, as Dr. Marom testified, (1) there were only two solutions to the known need to deflect light beams with MEMS: 1-axis or 2-axis, (2) a

person of ordinary skill would have had a high expectation of success to try two-axis mirror control in Bouevitch, and (3) the result of the combination would be predictable. *See* Pet. 21–22; Reply 8–9; Ex. 1045 ¶ 45.

With respect to Lin, Patent Owner argues that Petitioner fails to explain either how the multiple axes of Smith could be combined with Lin's analog control or how to modify Lin's structural elements to incorporate a two-dimensional rotation, and further asserts that, because it would require an engineering feat, it is not a simple substitution. PO Resp. 50–51. As explained above, however, the test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of another reference. Moreover, the references of record reflect that there are routinely complex design considerations in the fiber optic communications field. Patent Owner does not explain persuasively why combining the teachings of Smith and Lin would be beyond the skill of a skilled artisan, even if feats of engineering are contemplated.

Petitioner has articulated sufficiently reasoning with some rational underpinning to support the legal conclusion of obviousness based on the asserted combination of Bouevitch, Smith, and Lin. With regard to incorporating the teaching of a two-axis mirror in Smith with Bouevitch, we are persuaded that it is a simple substitution, notwithstanding the fact that it may require substantial engineering as a practical matter. Single-axis and two-axis mirrors were known to be interchangeable. Smith not only expressly acknowledges this interchangeability, but also identifies benefits to the use of a two-axis mirror: "in comparison to the two-axis embodiment, single axis systems may be realized using simpler, single axis MEMS arrays

but suffer from increased potential for crosstalk between channels."
Ex. 1004, 18:17–18; Ex. 1005, 12; *see also* Ex. 1004, 16:55–58, Ex. 1005,
11 ("both single and dual axis mirror arrays may be used in a variety of
switching configurations, although the two-axis components are preferred.")
The asserted combination of Smith and Bouevitch and Lin yields a
predictable result. *See KSR*, 550 U.S. at 416 ("The combination of familiar
elements according to known methods is likely to be obvious when it does
no more than yield predictable results.").

We are further persuaded that Petitioner has identified additional
"rational underpinning" in supported of the asserted combination.
Dr. Marom testified that applying the two-axis mirror of Smith to Bouevitch
would have been beneficial "because choosing only a single axis for both
port selection and attenuation may result in dynamic fluctuations of power
crosstalk between ports as attenuation level is varied," would reduce "the
risk of the signal bleeding into a port that is adjacent to the output port along
the switching axis, and would provide finer control over attenuation by
allowing the use of the full dynamic range of the mirror tilt in the first axis
for attenuation. *See* Ex. 1028 ¶¶ 73–75; *see also* Pet. 22. For similar
reasons Petitioner has also shown that the application of Smith to Bouevitch
constitutes the use of known techniques to improve similar devices. *See* Pet.
20–21.

We also find persuasive Petitioner's contention that a person of
ordinary skill in the art would have combined the teachings of Lin with
Bouevitch and Smith because:

> (1) continuously controlled mirrors were known to be
> interchangeable with discrete-step mirrors; (2) continuously

> controlled mirrors allow arbitrary positioning of mirrors and can more precisely match the optimal coupling value; and (3) Lin specifically teaches that its analog, continuous MEMS mirrors would be useful in optical switching applications like Bouevitch's and Smith's ROADM devices.

Pet. 30 (citing Ex. 1010 at 2:6–9; Ex. 1028 ¶ 62). Petitioner also has shown that the use of analog continuous control was the known alternative to discrete (or step-wise) control, and would have been obvious to try and expected to work when applied to Bouevitch. Pet. 30–31 (citing Ex. 1028 ¶¶ 61–65).

For the foregoing reasons, Petitioner has established by a preponderance of the evidence that claim 1 would have been obvious over Bouevitch, Smith, and Lin.[13]

> 2. Claims 2, 5, 6, 9, 10, 13, 15, and 16

Claims 2, 5, 6, 9, 10, 13, 15, and 16 ultimately depend from claim 1. In addition to addressing the elements of claim 1, we agree with Petitioner's identification of how claims 2, 5, 6, 9, 10, 13, 15, and 16 would have been obvious over Bouevitch, Smith, and Lin, as supported by the declaration of Dr. Marom. Pet. 35–37, 42–46, 49–53. For example, claim 2 requires "a control unit for controlling each of said beam-deflecting elements," and Petitioner has shown that it would have been obvious to apply the control unit disclosed by Smith to Bouevitch as it is the addition of a known element which yields the predictable result of electronic control. *See* Pet. 35–37. As another example, claim 13 requires that "beam-deflecting elements comprise micromachined mirrors." Petitioner has shown that mirrors disclosed in

---

[13] Patent Owner provides no persuasive evidence of secondary considerations to support the patentability of claims of the '368 patent.

Bouevitch and Smith are "micromachined mirrors." Pet. 49. Patent Owner has not raised additional arguments with respect to claims 2, 5, 6, 9, 10, 13, 15, and 16 beyond those asserted with respect to claim 1, addressed above. We have assessed the information provided and determine that Petitioner has established by a preponderance of the evidence that claims 2, 5, 6, 9, 10, 13, 15, and 16 would have been obvious over Bouevitch, Smith, and Lin.

      3.      Claims 3 and 4

      Claim 3, which depends from claim 1, further requires that the control unit "comprises a servo-control assembly, including a spectral monitor for monitoring power levels of selected ones of said spectral channels, and a processing unit responsive to said power levels for controlling said beam deflecting elements." Claim 4, which depends from claim 3, further requires that the "servo-control assembly maintains said power levels at predetermined values." The '368 patent states that:

> The electronic circuitry and the associated signal processing algorithm/software for such processing unit in a servo-control system are known in the art. A skilled artisan will know how to implement a suitable spectral monitor along with an appropriate processing unit to provide a servo-control assembly in a WSP-S apparatus according to the present invention, for a given application.

Ex. 1001, 12:9–15. Accordingly, the '368 patent expressly recognizes that the additional features of claims 3 and 4 were "known in the art" to a skilled artisan and would have been obvious to implement.

      We agree with Petitioner's contention that Smith's disclosure of a controller that receives feedback from an optical power monitor corresponds to the claimed servo-control assembly and spectral monitor, and serves the same purpose. Pet. 38–41 (citing, *inter alia*, Ex. 1004, Fig. 8, 18:42–53,

13:20–24). With regard to claim 4, Petitioner directs us to Smith, which teaches that the controller "adjust[s] the mirror positions to adjust the transmitted power to conform to one or more **predetermined criteria**." Pet. 41–42 (quoting Ex. 1004, 11:48–51).

Petitioner also provides sufficient articulated reasoning with some rational underpinning to support the combination of the Smith controller and optical power monitor with Bouevitch, including "as an alternative to the 'external feedback' for power control that Bouevitch explains should be eliminated," and that a person of ordinary skill "would appreciate that the feedback-driven control of Smith would improve the precision of the mirror-based switching system of Bouevitch." Pet. 39–41. Petitioner also reasons that it would have been obvious to try the predetermined power settings of Smith within Bouevitch, because "Smith teaches that predetermined power values could make up for inherent problems in optical switching, such as power variations from optical amplifiers and manufacturing and environmental variations, and because 'WDM systems must maintain a significant degree of uniformity of power levels across the WDM spectrum.'" *Id.* at 42 (quoting Ex. 1004, 6:24–50; citing Ex. 1028 ¶ 92).

Patent Owner argues, with virtually no explanation, that "Smith does not teach the service control and spectral monitory elements, as claimed." PO Resp. 55. Patent Owner also asserts that Petitioner fails to explain how or why a person of ordinary skill would have been able to add Smith's control features to Bouevitch without disrupting Bouevitch's operation because they are disparate technologies. *Id.* Patent Owner does not address the disclosure of the '368 patent, which states that a "skilled artisan will

know how to implement a suitable spectral monitor," or the reasoning provided by Petitioner. We have considered Patent Owner's arguments and find them to be insufficiently supported and conclusory. On the other hand, we conclude that Petitioner's reasoning is sound and supported adequately by the record. Petitioner has established by a preponderance of the evidence that claims 3 and 4 would have been obvious over Bouevitch, Smith, and Lin.

4.    Claim 11

Claim 11 depends from claim 1 and further requires "a beam-focuser for focusing said separated spectral channels onto said beam deflecting elements." Petitioner contends, and we agree, that Bouevitch discloses a "beam-focuser element at reflector 10 in Figure 11." Pet. 46; *see also* Ex. 1028 ¶ 101. Petitioner further explains that in Bouevitch "reflector 10 directs the separated beams of light $\lambda_1$ and $\lambda_2$ from the points on the reflector annotated as R onto the corresponding beam deflecting mirrors 51 and 52 in MEMS array 50." Pet. 46.

Patent Owner argues that Petitioner ignores the distinction between imaging/directing, as recited in claims 1 and 17, and "focusing" as recited in claim 11. PO Resp. 55–56. Patent Owner identifies no persuasive evidence in support of its argument, and does not explain what the distinction is that has been ignored. Claim 21 of the '368 patent recites "imaging comprises focusing," and Dr. Sergienko testified that "focusing" is a type of "imaging" in the '368 patent. *See* Ex. 1039, 245:13–19.

Petitioner has established by a preponderance of the evidence that Bouevitch discloses a "beam focuser," as recited in claim 11, and that claim 11 would have been obvious over Bouevitch, Smith, and Lin.

5.      Claims 17–22

Claim 17 is directed to "a method of performing dynamic add and drop in a WDM optical network" which includes elements substantially similar to features of apparatus claim 1.  Petitioner contends, and we agree, that Bouevitch discloses the first step of "separating an input multi-wavelength optical signal into spectral channels" at Figure 11, where diffraction grating 20 spatially separates combined channels $\lambda_1\lambda_2$ into spatially-separated channels.  Pet. 54 (citing Ex. 1003, 14:48–53, 8:10–22; Ex. 1028 ¶ 117).  Petitioner also contends that Bouevitch discloses imaging spectral channels onto a corresponding beam-deflecting element by using reflector 10 to image each channel onto a corresponding MEMS mirror element.  Pet. 54.  Petitioner asserts that other than for "dynamically," the method step for "controlling dynamically and continuously said beam-deflecting elements *in two dimensions* so as to combine selected ones of said spectral channels into an output multi-wavelength optical signal *and to control the power of the spectral channels combined into said output multi-wavelength optical signal*" would have been obvious for the same reasons articulated with regard to claim 1.  Pet. 55.  Petitioner also contends that:

> Both Bouevitch and Smith teach dynamic control during the operation of their add/drop devices. (Ex. 1028 at ¶ 122.) Bouevitch's device can be used as a "dynamic gain equalizer and/or configurable add/drop multiplexer," which plainly includes dynamic control of the mirrors that perform those actions. (*Id.*, 2:24-25.)  Smith notes that it "is well known" that

> power control "should be dynamic and under feedback control
> since the various wavelength components ***vary in intensity with
> time***." (*Id.*, 6:37-50; emphasis added, 2:23-31, 7:24-31). The
> Smith Provisional also supports dynamic control, as is apparent
> from the fact that the Smith OADM accepts control
> signals/commands as it operates. (*See* Smith Provisional, Fig. 11
> (noting "continuous" calibration and control by "network
> commands"), 7 (add/drop under control of an external (and thus
> changeable) signal); Ex. 1028 at ¶ 122.

*Id.* at 56. We find Petitioner's contentions persuasive.

In addition to relying on its arguments asserted with respect to claim 1, which we address above, Patent Owner further argues that Petitioner mistakenly asserts that Bouevitch teaches "imaging" because it teaches "focusing," and does not describe with any particularity how Bouevitch teaches "imaging." PO Resp. 51–52. As discussed above with regard to claim 11, we find Patent Owner's argument unpersuasive because Patent Owner offers no explanation for how it contends imaging should be distinguished from focusing, and identifies no evidence in support of its argument. Dr. Marom testified that "Claim 21 confirms that one type of such 'imaging' is focusing, by reciting 'the method of claim 17, wherein said ***imaging comprises focusing*** said spectral channels onto said beam–deflecting elements.'" Ex. 1028 ¶ 118. Dr. Sergienko testified that "focusing" is a type of "imaging" in the '368 patent. *See* Ex. 1039, 245:13–19.

Patent Owner also argues that Petitioner has shown no disclosure corresponding to controlling beam-deflecting elements so as to combine spectral channels into an output signal. PO Resp. 52. To the contrary, we agree with Petitioner that Bouevitch discloses a configurable optical

add/drop multiplexer (COADM) which combines spectral channels into an output signal.  Pet. 55–56.  Contrary to Patent Owner's argument, Petitioner also notes that Dr. Sergienko agreed that one point of a COADM is to combine one of the selected signals into the multi-wavelength output of the device.  Ex. 1039, 96:14–22.

Claims 18–22 ultimately depend from claim 17.  In addition to addressing the elements of claim 17, we agree with Petitioner's identification of how claims 18–22 would have been obvious over Bouevitch, Smith, and Lin, as supported by the declaration of Dr. Marom.  Pet. 56–60.  We understand Patent Owner to assert the same argument with respect to claim 21, which recites "imaging comprises focusing said spectral channels onto said beam –deflecting element," as Patent Owner asserts in regard to the focusing limitation of claim 11, and we find it not persuasive for the same reasons discussed above.[14]  We have assessed the information provided and determine that Petitioner has established by a preponderance of the evidence that claims 17–22 would have been obvious over Bouevitch, Smith, and Lin.

> E.  *Asserted Obviousness Over Bouevitch, Smith, Lin, and Dueck*

Petitioner contends claim 12 would have been obvious over Bouevitch, Smith, Lin, and Dueck.  Pet. 47–49.  Claim 12 recites the device of claim 1, wherein the wavelength-selective device comprises a device selected from the group consisting of ruled diffraction gratings, holographic

---

[14] The Patent Owner Response refers to claim 22 in regard to Patent Owner's contention that Bouevitch fails to teach "focusing;" however, claim 22 does not recite "focusing," whereas claim 21 does.  *See* PO Resp. 55–56.

diffraction gratings, echelle gratings, curved diffraction gratings, and dispersing prisms. Ex. 1001, 14:63–67.

Petitioner contends that any of the types of wavelength-selective devices recited in claim 12 would have been obvious because "[e]ach type was known in the prior art, each was interchangeable as a wavelength selective device, and each was one of a small set of possible choices." Pet. 48 (citing Ex. 1028 ¶¶ 103–104).[15] Petitioner also contends that Dueck discloses ruled diffraction gratings, as claimed. Pet. 48. Petitioner further asserts that it would have been obvious to try Dueck's ruled diffraction gratings in the devices of Bouevitch and Smith because it represents the "best mode" of separating wavelengths in WDM devices. *Id.* at 48–49.

Patent Owner argues that a person of ordinary skill would not have been motivated to use Dueck's diffraction grating. PO Resp. 52–54. According to Patent Owner, Dueck discloses a diffraction grating that reflects an input light beam to an output port at very nearly the same angle as the incident angle. *Id.* Patent Owner reasons that because no configuration shown in Bouevitch is designed to reflect a light beam at the same angle as Dueck, there is no motivation to use Dueck's diffraction grating in Bouevitch. *Id.* In reply, Petitioner asserts that Dueck was relied on only to show "prior art knowledge of diffraction gratings in general." Pet. Reply 23. As noted above, the obviousness test has no bodily incorporation requirement, and is instead focused on "what the combined teachings of

---

[15] Patent Owner suggests that because trial was instituted on a ground that included Dueck, we are precluded from considering Petitioner's arguments that claim 12 would have been obvious without Dueck. Our Institution Decision in this case contained no such limitation.

those references would have suggested to those of ordinary skill in the art."
*In re Keller*, 642 F.2d at 425. While the particular configuration of the ruled diffraction grating in Dueck may not be readily incorporated into Bouevitch, Dueck nonetheless discloses the broader concept of a ruled diffraction grating. Indeed, Dr. Sergienko testified that a ruled diffraction grating could have been used in Bouevitch, as well as holographic diffraction grating, or an echelle grating, as they are all reasonable substitutes for one another and would be expected to work. *See* Ex. 1039, 256:13–259:7.

We have assessed the information provided and determine that Petitioner has established by a preponderance of the evidence that claim 12 would have been obvious over Bouevitch, Smith, Lin, and Dueck.

### F. Conclusion

Petitioner has shown by a preponderance of the evidence that claims 1–6, 9–11, 13, and 15–22 would have been obvious over Bouevitch, Smith, and Lin, and that claim 12 would have been obvious over Bouevitch, Smith, Lin, and Dueck.

### IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, based on a preponderance of the evidence, claims 1–6, 9–13, and 15–22 of U.S. Patent No. RE42,368 are unpatentable; and,

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

Wayne O. Stacy
Sarah Guske
COOLEY LLP
wstacy@cooley.com
CapellaCisco@cooley.com

For PATENT OWNER:

Robert Greene Sterne
Jon E. Wright
Jason D. Eisenberg
Jonathan Tuminaro
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
rsterne-PTAB@skgf.com
jwright-PTAB@skgf.com
jasone-PTAB@skgf.com
jtuminar-PTAB@skgf.com